WILSON LINE, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8697.  Promulgated February 24, 1947.

*David P. Brown, Jr., Esq.,* for the petitioner.
*Paul E. Waring, Esq.,* for the respondent.

**OPINION.**

Arnold, *Judge*: The issue is whether the gain to petitioner realized upon the sale of the dismantled marine railway is subject to excess profits tax. Respondent concedes on the brief that the amount of the profit was $5,269.28, instead of $6,169.28, as originally determined.

In computing excess profits net income, gains or losses from sales or exchanges of capital assets held for more than six months are excluded, pursuant to section 711 (a) (1) (B), or 711 (a) (2) (D), of the Internal Revenue Code, as amended. The applicable regulations (sec. 35.711–(a) 2, Regulations 112) provide that, for the purpose of making this adjustment, gains and losses from sales or exchanges of

capital assets are determined under the definitions and in the manner provided in chapter 1 of the code. The term "capital assets" is defined for the purpose of chapter 1 of the code in section 117 (a).[1] Section 117 (j), as amended,[2] provides that certain gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than six months. This applies to gains from involuntary conversions or from the sale of property used in the business of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than six months, if it is not property of a kind includible in the taxpayer's inventory or property held primarily for sale to customers in the ordinary course of the taxpayer's business.

The property here involved was held for more than six months and there were no other sales of capital assets in the taxable year. The petitioner's contention is that the gain is to be treated as long term

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer ;

\*    \*    \*    \*    \*    \*    \*

[2] (j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable.

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph ;

(A) In determining under this paragraph whether gains exceed losses, the gains and losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsections (b) and (d) shall not apply.

(B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

capital gain under section 117 (j), since the property was removed involuntarily and held in storage for future use and was therefore property used in petitioner's business, and was of a character subject to the allowance for depreciation and was not includible in inventory or held for sale to customers in the ordinary course of petitioner's business. Petitioner contends, in the alternative, that the marine railway, in its dismantled state, constituted a capital asset held for more than six months, the sale of which in 1942 gave rise to long term capital gain, since it was not stock in trade, nor held for sale to customers in the ordinary course of petitioner's business, nor property of a kind which would properly be included in the petitioner's inventory. The petitioner says that under either alternative in computing its excess profits net income it is entitled, under section 711 (a) of the code, to exclude this gain.

The stored parts of the marine railway were not stock in trade of the petitioner, nor property held primarily for sale in the ordinary course of the petitioner's business, which was transportation by water. The property was not of a kind which would properly be included in the petitioner's inventory. Either the property constituted a capital asset or it was property, used in the trade or business, of a character which is subject to the allowance for depreciation, held for more than six months, and under section 117 (j), *supra*, the gain upon its sale is to be considered as gain from the sale of capital assets held for more than six months. This property does not come within any provisions of section 117 which would exclude the gain upon its sale from treatment as capital gain.

The respondent contends that when the marine railway was dismantled because of the condemnation of the land upon which it was situated the petitioner sustained a loss in useful value measured by the difference between the cost and the salvage value estimated to be recoverable, and that the amount received on the sale in May 1942 over this salvage value is a recovery of part of the loss which was sustained at the time of the removal and such recovery constitutes ordinary gain. Respondent says the 1937 transaction was the abandonment or scrapping of an asset not then sold, and the 1942 transaction was a recovery of salvage.

In computing gain or loss on the condemnation transaction the basis of the land and demolished structures was offset against the condemnation award. For this purpose the basis of the marine railway, adjusted for depreciation to the condemnation date, was reduced by the estimated salvage value of the preserved parts thereof. The gain reported on the condemnation transaction was reported as capital gain and, while the amount thereof was redetermined by the respondent, it was still treated as capital gain. In so far as the marine railway was concerned, the dismantling was treated as a closed transaction

for the purpose of computing gain or loss. This treatment was necessary for the determination of the gain on the condemnation transaction as a whole. The cradle, winch, motor, and other preserved parts were thereafter carried on petitioner's books at an estimated value of $2,500. The respondent accepted this basis in the adjustment of the condemnation transaction.

The respondent cites *Industrial Cotton Mills Co.*, 43 B. T. A. 107. In that case it was held that, where the taxpayer discarded certain machinery because of changes in business conditions, sold part for salvage value and junked the remainder, the loss sustained was not a loss upon sale of capital assets, but a loss resulting from a loss of useful value of capital assets and was deductible in full as an ordinary loss instead of being limited to $2,000 as in the case of a capital loss. The loss was reduced by the amount recovered from the sale of part of the machinery. The discarded machinery was useless to the taxpayer or to any one else engaged in similar manufacturing.

However, there was no such abandonment in the present case. The marine railway was, prior to December 2, 1937, an asset used in the taxpayer's business and subject to the allowance for depreciation provided in section 23 (1) of the Internal Revenue Code. It was, along with other properties, removed when the state condemned the tract of land upon which it was situated. The parts of the railway which were readily removable and could be used again on another location if petitioner chose to re-erect the railway were removed and preserved by the petitioner. The parts which could not be readily removed were abandoned. Other structures on the condemned land, including a wharf, were demolished. The petitioner built a new wharf to replace the one which had been upon the condemned land. Although the retained parts of the marine railway were not thereafter actually used by the petitioner, they could have been used by the petitioner, or any other owner of ships of a size within the capacity of the cradle, as a marine railway if the necessary land was procured and piling was driven upon which to lay the rails. The vice president and general manager of the petitioner testified that he was a member of the petitioner's board of directors and was the officer in charge of matters pertaining to the marine railway; that it was his intention at the time of the condemnation to re-erect the marine railway, but that the petitioner acquired new boats too large to be accommodated by this equipment and was able to have the hulls of its boats painted elsewhere, so that when an offer was received for the equipment the petitioner agreed to sell. The equipment was sold as a dismantled marine railway. This was not an abandonment of property no longer useful, but a careful preservation of property for possible further use by the petitioner, or at least for sale for use by others in its original capacity. There was no intent to abandon or discard this property. See *Newlyn Coal Co.*,

9 B. T. A. 835, and *Ewald Iron Co.*, 37 B. T. A. 798. Even though not actually used by the petitioner, it constituted property "used" in the trade or business within the meaning of section 117. *Yellow Cab Co. of Pittsburgh* v. *Driscoll*, 24 Fed. Supp. 993; *Kittredge* v. *Commissioner*, 88 Fed. (2d) 632, affirming B. T. A. memorandum opinion; *Independent Brick Co.*, 11 B. T. A. 862. Also, although no depreciation was taken or allowed, we think it was property which would deteriorate and was "of a character which is subject to the allowance for depreciation" within the meaning of section 117 (j). See *P. Dougherty Co.*, 5 T. C. 791; affd., 159 Fed. (2d) 269. Therefore, the gain was from the sale of "property used in the trade or business," as defined in section 117 (j) (1), and, under section 117 (j) (2), is to be considered as gain from the sale of capital assets held for more than six months.

We do not agree with the respondent that the proceeds of this sale were salvage and hence the gain was ordinary gain. Had the sale occurred before March 31, 1938, the capital gain on the condemnation transaction as a whole would have been accurately determined in the fiscal year of the condemnation, as was the case in *White Dental Manufacturing Co.* v. *United States*, 55 Fed. Supp. 117. Where, as here, a part of this gain is realized in a different taxable year, it is not of a different character.

We conclude that the gain on the sale of the marine railway should be excluded from excess profits net income.

Since other uncontested adjustments will require a recomputation of the petitioner's excess profits tax liability,

*Decision will be entered under Rule 50.*