LAWRENCE R. URI, JR. AND CATHALEEN T. URI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; STEVENS J. TOWNSDIN AND RENATE TOWNSDIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Uri v. Commissioner
Docket Nos. 16880-86; 16881-86.
United States Tax Court
T.C. Memo 1989-58; 1989 Tax Ct. Memo LEXIS 57; 56 T.C.M. (CCH) 1217; T.C.M. (RIA) 89058; February 7, 1989. Lawrence R. Uri, Jr., for the petitioners. Alan M. Jacobson, for the respondent. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioner
Taxable Year Ended
Deficiency
Lawrence R. Uri, Jr.
December 31, 1982
$ 10,180.00
and Cathaleen T. Uri  December 31, 1983
10,680.00
Stevens J. Townsdin
December 31, 1983
7,697.00
and Renate Townsdin  *60 The issues for decision are: (1) Whether for taxable years 1982 and 1983, petitioners have sufficient basis to allow them to deduct net operating losses from an electing small business corporation under subchapter S of the Internal Revenue Code; (2) whether the small business corporation is entitled to deductions for depreciation and accrued interest for its taxable year ended July 31, 1983; and (3) whether in 1983 petitioners must recapture investment tax credits claimed on prior years' returns for the assets of the small business corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Concordia, Kansas, at the time they filed their petitions in this case. Petitioners Lawrence R. Uri, Jr. and Cathaleen T. Uri filed joint Federal income tax returns for taxable years 1981, 1982, and 1983, as did petitioners Stevens J. Townsdin and Renate Townsdin. [1]
*61 Petitioners Cathaleen Uri (Mrs. Uri) and Stevens Townsdin (Mr. Townsdin) were Certified Public Accountants. Mrs. Uri and Mr. Townsdin were partners in an accounting practice, and they were the only shareholders of Townsdin & Uri, Chartered, a professional corporation consisting of their accounting practice. Mrs. Uri and Mr. Townsdin were the only partners in a partnership which owned an office building and leased it to Townsdin & Uri, Chartered. The Old Opera House Mall Company (hereinafter referred to as the corporation) was incorporated in August 1980, under the laws of the State of Kansas. The only shareholders were petitioners Mrs. Uri and Mr. Townsdin. Mrs. Uri and Mr. Townsdin each owned 50 percent of the outstanding stock of the corporation, and each contributed capital in the amount of $ 10,000. On August 11, 1980, the corporation elected to be taxed as a small business corporation under subchapter S of the Internal Revenue Code. The corporation, an accrual basis taxpayer, elected a taxable year ending on July 31. The corporation was in the business of renovating a building which it owned in downtown Concordia, Kansas, and operating a small shopping mall on the *62 premises. On August 7, 1980, the corporation applied for a loan with the Small Business Administration (SBA). In early 1981, the corporation, SBA, and Cloud County Bank and Trust (hereinafter referred to as "the bank") reached an agreement that the bank would provide all interim financing to the corporation until the renovation of the premises was completed. Mrs. Uri and Mr. Townsdin contemplated that upon completion of the renovation, the SBA would guarantee a new loan and that the new loan would be under the SBA's "502 Program," a program which provided loans at a special 8-1/2 percent interest rate. Proceeds of the new loan would be used to pay the interim loans. In July 1981, Mrs. Uri and Mr. Townsdin were informed that the SBA would not guarantee a new loan under the 502 Program, at the special 8-1/2 percent interest rate. On September 17, 1981, after negotiating terms with the SBA and the bank, the corporation executed a promissory note in favor of the bank in the amount of $ 210,000. Ninety percent of this loan was guaranteed by the SBA. The loan required fixed monthly payments and had a fixed maturity date. On the same date, Mrs. Uri and Mr. Townsdin executed personal *63 guarantees for the loan on forms provided by the SBA. Neither Lawrence Uri nor Renate Townsdin signed the guarantees. The interest rate on the new loan was 18 percent. The proceeds of this loan were used as follows: (1) Approximately $ 150,000--
to retire interim notes payable to
Cloud County Bank and Trust the
proceeds of which were used for
purchase and renovation of business
real estate.
(2) Approximately $ 31,500-- to retire interim notes payable to
Cloud County Bank and Trust the
proceeds of which were used for
purchase of inventory, machinery,
and equipment.
(3) Approximately $ 11,000-- to retire accrued interest on
interim construction notes.
(4) Approximately $ 4,000--   for retirement of accounts payable.
(5) Approximately $ 9,500--   for working capital.
Total:$ 210,000            In its loan application to the SBA, the corporation attached a forecast of its receipts, expenses, and profits for the years 1981, 1982, and 1983. This forecast, signed by Mrs. Uri on August 31, 1980, indicated that the corporation would have sufficient cash flow to make the payments in amounts required by the note *64 executed on September 17, 1981. During the renovation project, the corporation was required to submit quarterly financial statements to the SBA. The corporation's retail operations opened for business in July 1981. The business was comprised of retail shops, a delicatessen, and a dinner theater. The corporation operated each of the separate aspects of the business, and Mr. Townsdin devoted full time to the corporation in fiscal years 1981 and 1982. Between July 1981 and July 1982, the local economy experienced a severe decline. During this time, the corporation's income was insufficient to pay expenses and to repay the SBA loan. On July 31, 1982, the Board of Directors (Mrs. Uri and Mr. Townsdin) voted to cease all retail activity until further decision by the Board of Directors, and the corporation ceased operation of the retail portion of its business. At the time of the resolution, the corporation was indebted to the SBA in the amount of $ 234,593 and to Townsdin & Uri, Chartered, in the amount of $ 25,843. The corporation earned gross receipts of $ 294 during the taxable year ended July 31, 1983, which was generated by the rental of the dinner theater on several occasions *65 prior to December 31, 1982. On June 28, 1982, the Board of Directors of the corporation resolved that the corporation should propose a settlement to the SBA. The Board of Directors proposed that the SBA reduce the amount of liability of the corporation, the amount of the accrued interest and the principal of the note, to ten percent of the original note. Under this proposal, the corporation would retain all of its assets and pay off all other creditors as originally contracted. The corporation made several settlement offers after the June 28, 1982 resolution. The corporation agreed to offer to liquidate all its equipment and inventory, to use the proceeds to pay the interest on the note, and to purchase the real estate for $ 60,000. Mr. Townsdin spent a substantial amount of time negotiating on the corporation's behalf to reach a settlement agreement with the SBA. On August 10, 1982, the SBA sent letters to Mrs. Uri and Mr. Townsdin stating that the promissory note in the amount of $ 210,000 was in default, that all installments were accelerated, and that the entire unpaid balance was then due and payable. The letters made no reference to personal guarantees. On December 6, 1982 and *66 December 13, 1982, the SBA wrote letters to the attorney for the corporation stating that the SBA would not permit the obligors to retain title to the business real estate without full settlement of the loan balance, and that the obligors could liquidate the collateral themselves or permit liquidation by the SBA. The December 13, 1982 letter further stated that if satisfactory arrangements were not made by January 10, 1983, the SBA would proceed with foreclosure action. In December 1982, Mrs. Uri filed a petition under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court for the District of Kansas, and in January 1983, Mr. Townsdin also filed a petition under Chapter 7 in the Bankruptcy Court. In these bankruptcy proceedings, Mrs. Uri on May 26, 1983, and Mr. Townsdin on June 30, 1983, were each discharged from any liability for his or her personal guarantee of the SBA loan to the corporation. Mrs. Uri and Mr. Townsdin never paid any amounts as a result of their personal guarantee of the SBA guaranteed loan. On June 24, 1983, the corporation filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. On January 5, 1984, Mrs. Uri, Mr. Townsdin, and the corporation *67 filed suit against the SBA in the United States District Court for the District of Kansas for the alleged breach of a contract obligating the SBA to lend funds to the corporation under the 502 Program. They were unsuccessful in their litigation against the SBA. Throughout the corporation's fiscal year ended July 31, 1983, the corporation and petitioners were attempting to rejuvenate the corporation's business operations. On February 2, 1984, the corporation's bankruptcy case was converted to a case for liquidation under Chapter 7 of the Bankruptcy Code. The real estate, equipment, and inventory of the corporation were sold at a Marshal's sale on March 11, 1987. The corporation filed a Form 1120S, U.S. Small Business Corporation Income Tax Return, for taxable years ended July 31, 1981, July 31, 1982, and July 31, 1983. The corporation also filed a short period return for August 1, 1982 through January 8, 1983. This short period return was filed because of the intention to convert the corporation to a subchapter C corporation. This conversion never occurred. The corporation's Form 1120S for July 31, 1981 reflected a loss of $ 29,253. The corporation's Form 1120S for July 31, 1982 reflected *68 a loss of $ 94,330. The corporation's Form 1120S for July 31, 1983 reflected a loss of $ 60,656, which included an interest deduction of $ 39,364 and a depreciation deduction of $ 20,916. On their 1982 return, petitioners Lawrence and Cathaleen Uri deducted $ 47,165 as their share of the loss of the corporation. On their 1983 returns, petitioners Lawrence and Cathaleen Uri deducted $ 30,328, and petitioners Stevens and Renate Townsdin deducted $ 30,328, as their share of the reported loss of the corporation. OPINION The first issue is whether Mrs. Uri and Mr. Townsdin have sufficient basis to allow them to deduct their share of the corporation's net operating losses. The basis of Mrs. Uri and Mr. Townsdin that resulted from their initial investment of $ 10,000 each was extinguished by the losses they claimed on their 1981 returns. Unless they can show entitlement to additional basis, they are not entitled to the losses claimed on their 1982 and 1983 returns. Petitioners ask us to view the guarantee transactions as constructive loans from the bank to petitioners and, in turn, contributions of those same funds by petitioners to the capital of the corporation, which they contend *69 should increase their basis in the stock of the corporation under section 1374(c)(2)(A). [2]
Section 1374, [3] as in effect during the years in issue, allowed a shareholder in a subchapter S corporation to deduct his portion of the corporation's net operating loss from his gross income. Section 1374(c) limited the amount of the deduction to the sum of (1) the adjusted basis of the shareholder's stock in the corporation and (2) the adjusted basis of any indebtedness of the corporation to the shareholder. See Estate of Leavitt v. Commissioner,90 T.C. 206, 210 n.6 (1988), on appeal (10th Cir., July 18, 1988). *70 In Estate of Leavitt v. Commissioner, supra, decided subsequent to the trial of this case, we held that there must be an economic outlay or a realization of income by the shareholder in order to increase basis in the stock in a subchapter S corporation. For section 1374(c) purposes, the term "basis" is defined in section 1012, [4] which provides the general rule that the "basis of property shall be the cost of such property." Borg v. Commissioner,50 T.C. 257, 263-264 (1968). Section 1.1012-1(a), Income Tax Regs., defines "cost" to mean the "amount paid" for property "in cash or other property." Because petitioners' guarantees in this case do not constitute cash or other property, they cannot be included in the basis of petitioners' stock in the corporation. Estate of Leavitt v. Commissioner, supra.See Borg v. Commissioner, supra;Perry v. Commissioner,392 F.2d 458 (8th Cir. 1968), affg. 47 T.C. 159 (1966). *71 Petitioners argue that application of traditional debt-equity principles [5] to the facts of this case would show that the loan by the corporation was in substance a loan from the bank to the shareholders, who then advanced the proceeds of the loan to the corporation as a contribution to capital. In Estate of Leavitt v. Commissioner, supra, we specifically rejected the application of traditional debt-equity principles in making a determination of whether shareholders in a subchapter S corporation are entitled to additional basis as a result of their guarantee of the corporate indebtedness. Following Leavitt, we decline to adopt traditional debt-equity principles in this case. In their briefs, petitioners acknowledge the existence of the Leavitt opinion, but seem to argue that they are entitled to basis under the Leavitt opinion because Mrs. *72 Uri and Mr. Townsdin were "called upon to pay" the loan on the basis of their guarantees. Assuming that they were called upon individually to pay the loan which they guaranteed, we think that there is no doubt that our opinion in Leavitt requires more than a demand for payment of the guarantee. Leavitt requires an economic outlay, and Mrs. Uri and Mr. Townsdin never paid any part of the loan in question. See Perry v. Commissioner, supra;Pike v. Commissioner,78 T.C. 822, 839-840 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Petitioners argue that their losses are deductible because the losses would have been deductible by a partner in a limited partnership. Sections 752(a) [6] and 722 of the partnership provisions have been interpreted to allow limited partners to increase their basis in the partnership when they become personally liable to pay a nonrecourse partnership debt and the general partners have limited liability. Abramson v. Commissioner,86 T.C. 360 (1986). However, the corporation is not a partnership and petitioners are shareholders, not partners. Section 752(a)(1) has no *73 comparable provision in the subchapter S provisions and, accordingly, we will not apply the principles of section 752(a) in this case. Petitioners argue that the at-risk rules of section 465 operate independently of section 1374 to allow a shareholder in a subchapter S corporation to deduct losses when he is at risk. Section 465 limits the deduction a shareholder in a subchapter S corporation may take for his share of the corporation's loss to the amount he is at risk. Before applying the at-risk provisions of the Code, we must apply the loss limitation provisions of subchapter S. See Calcutt v. Commissioner,84 T.C. 716, 720 (1985). Section 1374(c)(2) is the subchapter S loss limitation provision. [7] Section 1374(c)(2) is "designed to insure that a taxpayer should not be able to deduct *74 a loss in excess of that which he really bears." Klein v. Commissioner,75 T.C. 298, 303 (1980). We have found section 1374(c)(2) limits both Mrs. Uri's and Mr. Townsdin's basis in the corporation to zero. Accordingly, section 465 is not applicable in this case. Since we find for respondent on this issue, we do not need to address whether the corporation is entitled to accrued interest and depreciation deductions. On each of their 1981 returns, petitioners took an investment credit for "section 38 property" [8] placed into service by the corporation. Respondent determined that the property ceased to be used in a trade or business after July 31, 1982 and, therefore, ceased to be section 38 property, requiring petitioners to recapture the investment credit in determining their 1983 tax liability. *75 Section 47(a)(1) requires a taxpayer to recapture a prior investment credit when the property on which the credit was based "ceases to be section 38 property." Section 1.48-1(b)(1), Income Tax Regs., requires that in each taxable year, the taxpayer must determine whether property which qualified as section 38 property in previous years continues to qualify as section 38 property. Property ceases to be section 38 property when depreciation is no longer allowable for the property. Sec. 1.48-1(b), Income Tax Regs.[9]
A depreciation deduction is allowable for property used in a trade or business or property held for the production of income. Sec. 167(a). Property is used in a trade or business if it is "devoted to the trade or business." P. Dougherty Co. v. Commissioner,5 T.C. 791, 795 (1945), affd. 159 F.2d 269 (4th Cir. 1946); *76 Yellow Cab Co. of Pittsburgh v. Driscoll,24 F. Supp. 993 (W.D. Pa. 1938). Property is "devoted to the trade or business" if it was once used in the business and has not been shown to have been withdrawn from business purposes. Kittredge v. Commissioner,88 F.2d 632, 634 (2d Cir. 1937), affg. 34 B.T.A. 1314 (1936). See Twentieth Century-Fox Film Corp. v. Commissioner,45 T.C. 137, 143 (1965), affd. 372 F.2d 281 (2d Cir. 1967); Wilson Line, Inc. v. Commissioner,8 T.C. 394, 399-400 (1947); P. Dougherty Co. v. Commissioner, supra at 795; Yellow Cab Co. of Pittsburgh v. Driscoll, supra.[10]
Property devoted to a trade or business does not lose its business character because it ceases to be actively used in the business as long as the corporation *77 continues to engage in a trade or business. Graves Brothers Co. v. Commissioner,17 T.C. 1499 (1952). See Wright v. Commissioner,9 T.C. 173 (1947); Williams v. Commissioner,T.C. Memo. 1960-19. In Williams v. Commissioner, supra, the taxpayer had purchased trucks and tractors for use in his business activities, which included lumbering, sawmilling, building, and farming. He had used the trucks and tractors primarily in his logging operations. Once the taxpayer had ceased his logging operations, the Court allowed the taxpayer to depreciate the tractors and trucks although they were seldom used, except occasionally in his farming and rental operations. The Court cited, with approval, the rule set forth in Yellow Cab Co. of Pittsburgh v. Driscoll, supra, "which stands for the principle that depreciation may be claimed on assets devoted to a taxpayer's business even though they are idle and are not actually used in the taxpayer's business in the years for which depreciation is claimed." Williams v. Commissioner, supra.
In this case, the depreciable assets had been devoted to the *78 corporation's retail operations prior to fiscal year ended July 31, 1983. On July 31, 1982, the Board of Directors voted to cease all retail activity until further decision. The theater was used for catering until December 31, 1982, generating income of $ 294. After December 31, 1982, the corporation ceased business operations. During fiscal year ended July 31, 1983, the corporation negotiated extensively with the SBA to reach a settlement agreement. When those efforts were unsuccessful, the corporation began to pursue litigation. On June 24, 1983, the corporation filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, seeking an arrangement with creditors which would result in the corporation's financial rehabilitation. During its fiscal year ended July 31, 1983, the corporation retained all equipment and inventory in hopes of resuming operations. The corporation filed a short period return during fiscal year 1983 because it intended to convert to a subchapter C corporation. The conversion never occurred and the corporation ultimately filed a return for fiscal year 1983. At the end of fiscal year 1983, the corporation's operations had not been permanently *79 discontinued and the assets had not been withdrawn from the business. The assets remained depreciable during that period. Because the assets continued to be depreciable section 38 property, petitioners are not required to recapture the investment credit during 1983. Our holding does not frustrate the objectives of the recapture rules. "Those rules were enacted to prevent the quick turnover of assets by taxpayers in an effort to obtain 'multiple tax credits'. H. Rept. No. 1447, 87th Cong., 2d Sess. 13 (1962), 1962-3 C.B. 405, 417; S. Rept. No. 1881, 87th Cong. 2d Sess. 18 (1962), 1962-3 C.B. 707. There is no threat of multiple tax credits here." Borgic v. Commissioner,86 T.C. 643, 654 (1986). The assets remained in place until they were sold at the Marshal's sale on March 11, 1987. The abuses Congress intended to prevent are therefore not present. Decision will be entered under Rule 155.
Footnotes
1. Lawrence R. Uri, Jr. is a party solely because he filed joint returns with Cathaleen T. Uri. Renate Townsdin is a party solely because she filed a joint return with Stevens J. Townsdin.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code, as in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. See Estate of Leavitt v. Commissioner,90 T.C. 206, n.6 (1988), on appeal (10th Cir., July 18, 1988), for the complete text of former section 1374 applicable to the years in issue. In 1982, Congress revised the rules pertaining to subchapter S corporations in the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669. The revisions in the 1982 Act do not apply in this case, however, because they apply only to taxable years beginning after December 31, 1982. Sec. 6(a), Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1697. The taxable years in this case are fiscal years beginning August 1, 1981 and August 1, 1982. The limitations provided in former section 1374(c)(2) were reenacted by section 2 of the Subchapter S Revision Act of 1982 as section 1366(d)(1), which is currently in effect.↩
4. Section 1012 provides: The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.↩
5. The debt-equity analysis usually is applied to guaranteed debts in cases involving subchapter C corporations in which respondent argues that advances made in the form of a guaranteed debt are in substance capital contributions. See Estate of Leavitt v. Commissioner, supra↩ at 214 n.8.
6. Section 752(a) provides that "Any increase in a partner's share of the liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership." Pursuant to section 722, a contribution of money by a partner to a partnership increases the partner's basis in the partnership.↩
7. Section 1374(c)(2) is comparable to section 704(d) of the partnership provisions.↩
8. Section 38 property is defined as property "(1) with respect to which depreciation * * * is allowable * * *, (2) which has an estimated useful life of 3 years or more * * *, and (3) which is either (i) tangible personal property, or (ii) other tangible property * * *." Sec. 1.48-1(a), Income Tax Regs.↩
9. Legislative history provides: Additional examples of property ceasing to be section 38 property include (1) property * * * which is no longer subject to depreciation * * * because, for example, it shifted from a business to a personal use * * *. [H. Rept. 1447, 87th Cong., 2d Sess. 13 (1962), 1962-3 C.B. 405↩, 510.]
10. See also Maier Brewing Co. v. Commissioner,T.C. Memo. 1987-385, on appeal (9th Cir., November 25, 1988); Tarutis v. Commissioner,T.C. Memo. 1982-313; Lenington v. Commissioner,T.C. Memo. 1966-264; Williams v. Commissioner,T.C. Memo. 1960-19↩.